David **HEFFELFINGER, Andrew Hinds and Rodney Dwyre, on behalf of themselves, the general public and all others similarly situated, Plaintiffs,**

v.

**ELECTRONIC DATA SYSTEMS CORPORATION, a Delaware corporation, and Does 1 through 100, inclusive, Defendant.**

**No. CV 07–00101 MMM (Ex).**

United States District Court, C.D. California.

June 6, 2008.

Eric M. Epstein, Eric M. Epstein Law Offices, Los Angeles, CA, Mark R. Thierman, Thierman Law Firm, Reno, NV, Walter L. Haines, United Employees Law Group, Long Beach, CA, for Plaintiffs.

Anthony S. Brill, Margaret Rosenthal, Sabrina L. Shadi, Baker And Hostetler, Los Angeles, CA, Chris Bator, David A. Posner, Gregory V. Mersol, Martin T. Wymer, Baker and Hostetler, Cleveland, OH, Mary Price Birk, Baker & Hostetler LLP, Denver, CO, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DIRECTING CLERK TO STRIKE PLAINTIFFS' UNAUTHORIZED SURREPLY

MARGARET M. MORROW, District Judge.

On November 28, 2006, David Heffelfinger, Andrew Hinds, and Rodney Dwyre filed this class action against Electronic Data Systems Corporation ("EDS") in Los Angeles Superior Court, alleging that EDS had failed to pay overtime to certain classes of information technology workers in its California facilities. EDS removed the action on January 9, 2007, invoking

federal jurisdiction under the Class Action Fairness Act of 2005, Pub.L. No. 109–2, § 4(a), 119 Stat. 9 (codified in relevant part at 28 U.S.C. § 1332(d)(2)). Plaintiffs' complaint alleges four state law claims: (1) unpaid overtime in violation of the California Labor Code, (2) failure to provide meal and rest periods in violation of the California Labor Code, (3) waiting penalties under the California Labor Code based on unpaid overtime, and (4) unfair competition in violation of California's Business and Professions Code § 17200.[1] On January 7, 2008, the court certified the following class under Rule 23(b) (3):

> "[A]ll current and former employees who were employed within the State of California by [EDS] as Data Base Administrators, Senior Systems Administrators, Systems Engineers, and Information Analysts (hereinafter referred to collectively as 'Information Technology Workers') during the period commencing four years prior to the filing of this Complaint and ending on the date of judgment, who performed work in excess of eight hours in one day and/or forty hours in one week, and did not receive overtime compensation as required by Labor Code, Section 510, and Wage Order No. 4–2001, Section 3...."[2]

EDS sought leave from the Ninth Circuit to appeal the certification order under Rule 23(f), and filed a motion to stay the case pending appeal. On March 14, 2008, the Ninth Circuit denied EDS's application, mooting its motion to stay. On April 21, 2008, EDS filed a motion for summary judgment and a motion to decertify the class. This order addresses both motions.

## I. FACTUAL BACKGROUND

### A. Undisputed Facts

### 1. The Structure of EDS

EDS is a leader in the global information services industry; one aspect of EDS's work is to manage computers, networks, information-processing facilities, and projects for customers.[3] EDS's California customer base is diverse, including such entities as the United States Department of Defense ("DOD"), Medi–Cal, various commercial airlines, San Diego County Health and Human Services, Toshiba, Lenovo/IBM, and Sony/Ericsson.[4] Some of EDS's California employees work from home, while others work at locations owned either by EDS or by the customer to whose account the employee is assigned.[5] EDS employs Information Technology workers ("IT workers") in four relevant job codes at multiple locations in the state.[6]

#### a. Seaside Location

Heffelfinger and Hinds worked at a facility in Seaside, California.[7] The Seaside facility is owned by the Department of Defense ("DOD"); approximately 300 EDS

---

1. The court dismissed plaintiffs' conversion claim on June 25, 2007.

2. See Order Granting in Part and Denying in Part Plaintiff's Motion for Class Certification ("Class Cert. Order"), Docket No. 46 at 24 n. 58.

3. Defendant's Statement of Undisputed Facts ("Def.'s Facts"), ¶¶ 2–3; Plaintiffs' Statement of Genuine Issues ("Pl.'s Issues"), ¶¶ 2–3.

4. Def.'s Facts, ¶ 8, Pl.'s Issues, ¶ 8.

5. Def.'s Facts, ¶ 10; Pl.'s Issues, ¶ 10.

6. As set forth in the class definition, the relevant job codes are Data Base Administrator, Senior Systems Administrator, Systems Engineer, and Information Analyst.

7. Def.'s Facts, ¶ 32. Plaintiffs dispute this fact, but it appears that their dispute concerns EDS's description of the client at the Seaside location, rather than the fact that they worked at that location. (See Pl.'s Issues, ¶ 32.)

employees work there, together with a number of DOD employees and other contractors.[8] The Seaside facility houses the Defense Manpower Data Center ("DMDC"), which is a subsidiary program of DOD.[9] DMDC is responsible for a database that keeps track of armed services members, retirees, and dependents.[10] The EDS employees working at DMDC's Seaside facility are divided into teams, each of which works on one or more of the areas within EDS's responsibility; each team has a Team Lead, who is typically an employee in either the Information Specialist Senior or Systems–Administrator Senior Job Code.[11]

### b. Ranch Cordova

EDS employees at Rancho Cordova work for several EDS customers that provide services to public assistance recipients in California, including Medi–Cal.[12] Specifically, they support the production system for processing claims, working either in "technical delivery" (developing software) or "service delivery" (improving existing software).[13] Several of the System Administrator Seniors and Information Analysts who work at Rancho Cordova have "Technical Lead" responsibility.[14]

### c. Cerritos

Most EDS employees in the relevant job codes who report to managers at the Cerritos location work from home or at other locations owned by EDS customers.[15] Some work for GEARS, a Los Angeles County welfare program. EDS is responsible for managing GEARS's information databases, determining its business requirements, and assisting it with software upgrades.[16] Other employees at the Cerritos location perform work for various airlines. The airlines use a common software program, and EDS is responsible for cus-

---

8. Def.'s Facts, ¶ 35; Pl.'s Issues, ¶ 35.

9. Def.'s Facts, ¶ 34. Plaintiffs dispute this fact, citing nineteen paragraphs of Heffelfinger's and Hinds' declarations. It does not appear from this testimony that plaintiffs actually dispute that DMDC is located at the Seaside facility. As with many other facts that are purportedly controverted, plaintiffs do not explain the precise nature of their dispute with defendant's factual statement, and the court is unable to discern it from the evidence cited. The court, in fact, is not required to sift through large volumes of evidence to divine the nature of the parties' dispute. Cf. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001) ("A lawyer drafting an opposition to a summary judgment motion may easily show a judge, in the opposition, the evidence that the lawyer wants the judge to read. It is absurdly difficult for a judge to perform a search, unassisted by counsel, through the entire record, to look for such evidence"). Rather, it is the party's obligation to state it.

10. Def.'s Facts, ¶ 36; Pl.'s Issues, ¶ 36. The DMDC manages information regarding approximately 28 million individuals. It stores data, including service records, insurance services and entitlements, locations, and tracking information regarding service members' dependents. (Def.'s Facts, ¶ 37; Pl.'s Issues, ¶ 37.)

11. Def.'s Facts, ¶ 40–41; Pl.'s Issues, ¶ 40–41. At most EDS locations, IT workers are divided into different teams. Each team has a Team Lead, who is typically an EDS employee in the Database Administrator or Systems Administrator–Senior job code. (Def.'s Facts, ¶ 29; Pl.'s Issues, ¶ 29.) Some teams have Technical Leads who direct the work of others and make recommendations of consequence about overall project direction. (Def.'s Facts, ¶ 31; Pl.'s Issues, ¶ 31.)

12. Def.'s Facts, ¶ 51; Pl.'s Issues, ¶ 51.

13. Def.'s Facts, ¶ 52; Pl.'s Issues, ¶ 52.

14. Def.'s Facts, ¶ 55; Pl.'s Issues, ¶ 55.

15. Def.'s Facts, ¶ 57; Pl.'s Issues, ¶ 57.

16. Def.'s Facts, ¶¶ 59–60; Pl.'s Issues, ¶¶ 59–60.

tomizing and maintaining the program for them.[17]

### d. San Diego

EDS employees also work at a site in San Diego owned by Northrop Grumman ("Northrop"). Northrop has a contract with San Diego County that concerns the provision of social services; EDS is Northrops' subcontractor, responsible for providing operational and developmental support for various Health and Human Services ("HHS") software applications. EDS employees in San Diego monitor the county's HHS computer system and track events such as visits by social workers and mental health services provided to persons on public assistance.[18]

### e. Irvine

Employees at EDS's Irvine facility work with EDS-owned software applications that track warranty claims processing for a number of EDS customers. They can and routinely do work from home, and have broad discretion both in and out of the office to plan projects, formulate solutions, and allocate their time and resources. Irvine-based employees gather and develop customer requirements, and work with customers in an interactive, creative process to formulate solutions for potential future problems.[19]

### 2. The IT Workers

### a. Named Plaintiffs

### i. David Heffelfinger

Heffelfinger is a former EDS employee who worked exclusively at the Seaside facility on the DMDC account.[20] Heffelfinger was within the Database Administrator job code.[21]

The parties dispute many of the details of Heffelfinger's duties. The essential outlines of his job, however, are not controverted. Heffelfinger received a degree in telecommunications, multimedia, and applied computing, and took additional courses in a number of programming and technical areas.[22] To further his education and stay current with technology, Heffelfinger regularly attended trade shows, conferences, and training seminars.[23] In the course of his employment, Heffelfinger served as DOD's representative to outside entities that developed software for the

---

17. Def.'s Facts, ¶¶ 64–65; Pl.'s Issues, ¶¶ 64–65.

18. Def.'s Facts, ¶¶ 69–71; Pl.'s Issues, ¶¶ 69–71.

19. Def.'s Facts, ¶¶ 75–78; Pl.'s Issues, ¶¶ 75–78.

20. Def.'s Facts, ¶ 84; Declaration of David Heffelfinger in Opposition to Motion for Summary Judgment ("Heffelfinger Decl."), ¶ 8.

21. Heffelfinger Decl., ¶¶ 2, 7. In his deposition, Heffelfinger stated that he was a "Information Specialist Senior" and a "Team Lead." (Def.'s Facts, ¶ 85.) Plaintiffs appear to dispute EDS's characterization of the *tasks* Heffelfinger performed, but not the fact that he was an "Information Specialist Senior" and "Team Lead." (Pl.'s Issues, ¶ 85.) Information Specialist Senior is not one of the job codes included in the class definition, and the parties do not explain the difference between a "database administrator" and an "information specialist senior." The only insight provided is Heffelfinger's testimony that, as compared with Information Specialists, "Information Specialist seniors get paid more money. And also, [they] take on some more technical leadership duties along with that position." (Deposition of David Heffelfinger ("Heffelfinger Depo.") at 41:7–9.) It is not clear from this testimony whether "information specialist" is a subcategory of "database administrator," or whether there is some other distinction between the job codes. Despite this ambiguity, however, the parties do not disagree on the broader point that Heffelfinger was a "database administrator."

22. Def.'s Facts, ¶ 90; Pl.'s Issues, ¶ 90.

23. Def.'s Facts, ¶ 89; Pl.'s Issues, ¶ 89.

agency, to ensure that their software was compatible and complied with DOD's network protocols.[24] Heffelfinger recommended changes to the government's hardware systems that were accepted approximately fifty percent of the time.[25] As a Team Lead, he was responsible for managing other team members by coordinating and directing their work, determining and meeting schedules, deciding when to refer an issue to his superior or to a vendor, dealing with DOD representatives, and providing Tier III and Tier IV support.[26] Heffelfinger represented the team in various meetings; monitored the status of its projects; and insured that team members completed their assignments.[27] As he described it, team members "did the heavy lifting work, and when they needed to make a technical decision going one way or the other, [he] resolved disputes."[28]

Heffelfinger also attended meetings of the Seaside Technical Review Board ("TRB")[29] once a week and provided input on such technical matters as whether to install or replace network software applications.[30] It is undisputed that he generally determined how to spend his work days.[31]

### ii.   Andrew Hinds

Like Heffelfinger, Andrew Hinds is a former EDS employee who worked at the Seaside facility. Hinds was a Systems Administrator Senior on Heffelfinger's team who served as backup Team Lead. He was responsible for high-level problem-solving and for implementing specialized tools with respect to the Oracle data base. Hinds provided solutions for DOD's technical issues; this included leading/coordinating operational support and implementation

24.   Def.'s Facts, ¶ 92; Pl.'s Issues, ¶ 92.

25.   Def.'s Facts, ¶ 91; Pl.'s Issues, ¶ 91. EDS asserts that Heffelfinger made recommendations to DOD, while Heffelfinger testified that he made recommendations to the "government." Although plaintiffs emphasize this distinction, they do not explain its significance, and on the present record, it appears to have none.

26.   Def.'s Facts, ¶ 94; Pl.'s Issues, ¶ 94. The parties do not explain what "Tier III and Tier IV" support entails, but agree that the provision of such support requires a high level of technical expertise. (Def.'s Facts, ¶ 12; Heffelfinger Decl., ¶ 20.) EDS contends that Tier III and IV "are the two highest levels of support offered by EDS on the DOD account and involve only the most complex issues that require a high level of discretion and independent judgment." (Def.'s Facts, ¶ 12; Defendant's Compendium of Evidence in Support of Motion for Summary Judgment ("Compendium"), Exh. 4 ("Declaration of Mike Randall in Opposition to Plaintiff's Motion for Class Certification" ("Randall Class Cert. Decl."), ¶ 15).) Heffelfinger asserts that "[w]hile Tier III and Tier IV support issues required a high level of technical expertise, they did not necessarily need discretion or independent judg-

ment." (Heffelfinger Decl., ¶ 19.) Notably, Heffelfinger does not contend that Tier III and Tier IV support never involve the exercise of discretion or independent judgment; rather, he states that they do not *necessarily* require it.

27.   Def.'s Facts, ¶¶ 95, 97; Pl.'s Issues, ¶¶ 95, 97.

28.   Def.'s Facts, ¶ 98; Pl.'s Issues, ¶ 98 (quoting Heffelfinger Depo. at 60).

29.   Def.'s Facts, ¶ 101. EDS asserts that Heffelfinger "participated" in TRB meetings "along with EDS managers and DOD representatives." (*Id.*) Although Heffelfinger concedes that he participated, he contends that "the only members of the TRB were DOD employees" and that his only role was to "attend[] meetings and provide[] technical expertise in assisting the Board understand the issues involved with the proposals that were brought before it." (Heffelfinger Decl., ¶ 27.)

30.   Def.'s Facts, ¶¶ 103–04; Pl.'s Issues, ¶¶ 103–04.

31.   Def.'s Facts, ¶ 106; Pl.'s Issues, ¶ 106.

for DOD's database administration. Hinds was the "point man" with respect to all technical issues regarding DOD's "common access card system."[32]

### iii. Rodney Dwyre

Rodney Dwyre is a former EDS employee who worked for four years at EDS's Rancho Cordova facility on the Medi–Cal account. His job code when hired was "Systems Engineer"; eventually, he became an "Information Analyst."[33] Dwyre was highly skilled, and an expert in CICS applications, including some that he wrote himself.[34] Beginning in 2005, Dwyre became a "Technical Team Lead" on a specialized assignment for Medi–Cal, working on the "Healthcare Common Procedure Coding System" ("HCPCS"). As Technical Team Lead, he oversaw team members, distributed assignments, and followed up to ensure that assignments were completed to Medi–Cal's satisfaction.[35] The HCPCS project was critical to Medi–Cal's business operations. It was a highly visible and important project that if not implemented correctly, would have "crash[ed] the whole claims processing system."[36]

As Technical Team Lead, Dwyre was the "main analyst" on the project.[37] He held weekly team meetings to discuss progress. He also reviewed results with Medi–Cal, which gave input and sometimes asked that additional tests be run. Dwyre then assigned a specific team member to make the requested change. Dwyre interacted with the client and led team meetings; he testified that customers paid attention to his opinions.[38] Dwyre, on his own initiative, worked to simplify and clarify the HCPCS technical guide and add content improvements. He did this because he felt it was necessary, and he drew on his expertise with the project to make the improvements.[39]

In addition to his involvement in the HCPCS project, Dwyre worked as an Information Analyst on other Medi–Cal projects that involved compliance with the federal Healthcare Accountability and Portability Act of 1996 ("HIPAA"). Dwyre wrote three or four new CICS programs that created a new CICS subsystem for provider enrollment.[40]

Dwyre identified the work he needed to do each day to complete his assigned projects. He interacted with his supervisor largely to keep her informed of the status of his work or to discuss human resources issues; his supervisors did not have the

---

32. Def.'s Facts, ¶¶ 107–12; Pl.'s Issues, ¶¶ 107–12.

33. Def.'s Facts, ¶¶ 119–21; Pl.'s Issues, ¶¶ 119–21.

34. Def.'s Facts, ¶ 135; Pl.'s Issues, ¶ 135. Dwyre attended at least one Linux training session. (*Id.*)

35. Def.'s Facts, ¶¶ 122–23; Pl.'s Issues, ¶¶ 122–23. The members of Dwyre's team included four to five programmers, one or two business analysts, and a technical writer. (Def.'s Facts, ¶ 130; Pl.'s Issues, ¶ 130.)

36. Def.'s Facts, ¶¶ 128–29; Pl.'s Issues, ¶¶ 128–29.

37. Declaration of Rodney Dwyre in Opposition to Defendant's Motion for Summary Judgment ("Dwyre Decl."), ¶ 12. EDS does not dispute this; in fact, it alleges that Dwyre "headed up" the project until he left EDS in 2006. (Def.'s Facts, ¶ 127.) Dwyre disputes this characterization, noting that he was at all times closely supervised by the project and team managers. (Dwyre Decl., ¶ 12.)

38. Def.'s Facts, ¶¶ 133–34, 37; Pl.'s Issues, ¶¶ 133–34,

39. Def.'s Facts, ¶ 138; Pl.'s Issues, ¶ 138.

40. Def.'s Facts, ¶ 140; Pl.'s Issues, ¶ 140. Dwyre states that in addition to writing certain new programs, he revised "scores of others." (*Id.*)

technical knowledge necessary to direct him in accomplishing his project goals.[41]

### b. IT Workers in General

Each of the named plaintiffs performed non-manual office work.[42] As a general matter, all of the IT employees who are class members work to ensure that customer network hardware is structured and configured to run the various computer systems and applications EDS customers use efficiently.[43] All IT workers employed by EDS provide Tier III and Tier IV support,[44] and routinely meet with clients and advise them on best practices.[45]

## B. Disputed Facts

Although many relevant facts are undisputed, including the specific job responsibilities of the named plaintiffs and other IT workers, the parties characterize the nature of the work in distinctly different fashions. EDS asserts that its IT workers performed "complex" or "difficult" tasks that require "discretion."[46] Although plaintiffs do not respond directly to this assertion in their statement of genuine issues, they consistently characterize the tasks class members perform as non-complex and involving little or no discretion. The manner in which the parties characterize the employees' job requirements does not control whether the employees were or were not exempt from California's overtime requirements as a legal matter. Rather, it is the nature of the job duties themselves, which is undisputed, which controls resolution of the key legal question.[47]

### 1. IT Workers in General

As noted, EDS contends that its IT workers "define and describe" best practices for their clients, and provide Tier III and IV support, which requires "a high level of discretion and independent judgment."[48] It relies in this regard on the declaration of Mike Randall, which was submitted in opposition to plaintiffs' mo-

---

**41.** Def.'s Facts, ¶ 143; Pl.'s Issues, ¶ 143.

**42.** Def.'s Facts, ¶ 144; Pl.'s Issues, ¶ 144. The parties appear to agree that this is true of all class members.

**43.** Def.'s Facts, ¶ 13; Pl.'s Issues, ¶ 13.

**44.** Def.'s Facts, ¶ 11. Plaintiffs dispute certain aspects of EDS's description of IT workers' responsibilities, i.e., the fact that they determined best practices for clients. They do not dispute that IT workers provided Tier III and Tier IV support, however. (Pl.'s Issues, ¶ 11.) Heffelfinger's declaration makes it clear that IT workers followed the client's policies and procedures when working on Tier III and IV issues. (Heffelfinger Decl., ¶ 19.)

**45.** Def.'s Facts, ¶ 11. Heffelfinger does not deny that he frequently met with clients; as respects best practices, he testified that "my teams did not define best practices for clients. We suggested best practices to them and they either took our suggestions or did not. As the contractor, EDS described best practices, but

the client defined best practices." (Heffelfinger Decl., ¶ 15.)

**46.** See, e.g., Def.'s Facts, ¶¶ 25, 27, 31; Pl.'s Issues, ¶¶ 25, 27, 31.

**47.** The parties raise numerous evidentiary objections. Plaintiffs object to certain portions of the declarations submitted by EDS's managers and employees on grounds that they (1) lack personal knowledge; (2) constitute hearsay; and (3) are improper lay opinion. As discussed more fully *infra* at note 116, the court does not rely on any of the challenged testimony in deciding the motion. It thus declines to address the objections. Plaintiffs also assert that certain of the declarations that support EDS's motion for summary judgment are inconsistent with the declarations it filed in opposition to the motion for class certification. Because the court decides the motion solely on the basis of undisputed evidence, it need not resolve whether EDS's declarations are inconsistent or sham.

**48.** Def.'s Facts, ¶¶ 11–12.

tion for class certification.[49] Plaintiffs counter with Heffelfinger's declaration, which states that "[n]o duties performed for the customer required a high degree of discretion or independent judgment, and there was no discretion exercised in the carrying out of duties at the Seaside location."[50] More specifically, Heffelfinger states that

"[a]ll decisions that affected changes to the network, software, or structure of the systems at DMDC had to have both government oversight and approval prior to being implemented. There was a 'Change Review Board' at the Seaside facility which had to approve all changes.... All decisions that would require discretion and independent judgment would have to be taken to the client ... for a decision about which course of action to take."[51]

Heffelfinger's testimony mirrors that of Dwyer, who states:

"Any 'discretion or independent judgment' I had in my job (1) was minor and supervised and (2) was limited for the most part to technical issues. What I would call 'high level decisions' were decided way above my level. In my 25 years of programming I never made

what I would consider a 'high level decision' as a programmer, and even rarely as an analyst. Examples of typical decisions are: Whether to use an IF or an EVALUATE statement in COBOL;[52] or whether to use a binary or serial search. Software customization is rarely 'extremely difficult,' especially to experienced programmers and does not, in my experience, require the making of 'numerous high level decisions with a great deal of initiative, independent judgment, planning and discretion.' "[53]

Similarly, Hinds testified that at Seaside, IT workers "could exercise only limited discretion and independent judgment, typically about technical matters, and under supervision of management."[54] This generalized dispute concerning the level of discretion and judgment exercised by members of the class is replicated in the parties' arguments regarding the individual job codes at issue.

### 2. Database Administrators and Systems Administrator–Seniors

It is undisputed that EDS Database Administrators and Systems Administrator Seniors are involved in designing system architecture.[55] It is also undisputed

---

49. *Id.*

50. Heffelfinger Decl., ¶ 18.

51. *Id.*

52. IF and EVALUATE statements are apparently different commands in COBOL, which is a programming language.

53. Dwyer Decl., ¶ 15.

54. Hinds Decl., ¶ 8. Hinds asserts that he limited discretion. He notes that if he discovered a problem with a server, which indicated that more memory was needed, he had to get approval before making any changes; if he determined that more servers were needed, he had to recommend that servers be obtained and be approved by DOD; etc. (*Id.*, ¶ 8(a-b).)

55. Def.'s Facts, ¶ 15. Plaintiffs dispute this fact, citing Heffelfinger's testimony that "[t]he Administrators suggested various architectures but the final decision as to what architectural choices were made always rested with the client." (Heffelfinger Decl., ¶ 23.) While Heffelfinger suggests that Administrators did not have ultimate responsibility for designing the architecture, he clearly indicates that they were "involved" in designing the architecture. Plaintiffs similarly do not dispute EDS's description of what it means to design the architecture. EDS asserts that it "involves designing and/or writing the various elements of a network or software program to accommodate the interest of the various stakeholders." (Def.'s Facts, ¶ 15.) The design must create a network that works seamlessly through updates, patches, and server failures. (*Id.*)

that employees in these job codes write computer code.[56] The parties' principal dispute concerns the extent to which the administrators exercise independent judgment and perform high level work. EDS asserts that Database Administrators and System Administrator Seniors address complex design challenges related to database architecture and provide a high degree of customization to meet customers' needs.[57] Plaintiffs dispute this, citing Heffelfinger's and Hinds' declarations. Heffelfinger states that, although he "presented logical representations of network design," DOD always took his presentations under advisement to "plan[ ] out the proper hardware and implementation details."[58] He reports that "any customization [had] to be proposed and approved by the customer prior to implementation."[59] Notably, Heffelfinger does not dispute that he (and inferentially employees in these job codes) presented architectural solutions and proposed customization. He merely contends that the client made the final decision as to what program would be implemented. At root, therefore,

plaintiffs' dispute with EDS regarding the level of work perform by the administrators concerns the fact that customer approval was required to proceed.

Heffelfinger describes his general duties as a database administrator in the following terms:

"I was responsible for the design and integrity of the data base structures in a multi-user environment, developing and enforcing data base standards and procedures, analyzing data and process requirements, leading or participating in logical and physical data base design, reviewing system and programming designs to ensure efficient use of data base resources, maintaining control programs required for accessing a data base, interfacing with operations data base support group on production problems and data base management issues, monitoring data base performance statistics and recommending improvements, advising systems engineers and updating management on data base concepts and techniques, and researching new data base technologies."[60]

56. Def.'s Facts, ¶ 16. EDS asserts, but plaintiffs dispute, that the code is "complex." Heffelfinger states that employees in these job codes "write simple shell scripts, which are a very basic form of computer code." (Heffelfinger Decl., ¶ 11.)

57. Def.'s Facts, ¶ 17.

58. Heffelfinger Decl., ¶ 24.

59. Id., ¶ 26.

60. Id., ¶ 6. Notably, Heffelfinger's description of his job duties is similar to the job description for "database administrators" presented to the court in the context of class certification. That description stated:

"under minimal direction, responsible for the design and integrity of data base structures in a multi-user environment. Develops and enforces data base standards and procedures. Analyzes data and process requirements. Leads or participates in logical and physical data base design. Reviews system and programming designs to ensure

efficient use of data base resources. Maintains control programs required for accessing a data base. Interfaces with operations data base support group on production problems and data base management issues. Monitors data base performance statistics and recommends improvements. Advises systems engineers and updates management on data base concepts and techniques. Researches new data base technologies." Declaration of Mark R. Thierman in Support of Plaintiffs' Motion for Class Certification ("Thierman Class Cert Decl."), Exh. E (Job Descriptions).

At the hearing, plaintiffs argued that, standing alone, the job descriptions raised triable issues of fact regarding class members' exempt status. Plaintiffs did not resubmit, or rely on, the job descriptions in opposing summary judgment, however. Both plaintiffs and EDS focused instead on the specific duties of the named plaintiffs. Consequently, the job descriptions were not properly part of the summary judgment record and cannot be

Hinds, who was a Senior Systems Administrator, provides less detail, noting that he "essentially maintained and managed the 'Oracle' database application so that the system was 'up and running.' In that regard, [he] participated in operational support and implementation activities for client databases, back up, recovery, configuration, upgrades, patches, assigning roles, creating users, and general trouble shooting." [61]

### 3. Information Analysts

It is undisputed that EDS Information Analysts write code and solve network and software issues. Information Analysts sometimes develop software and other times improve existing software.[62] The parties agree that the analysts create and

used to raise a triable issue of fact. See *Schneider v. TRW, Inc.*, 938 F.2d 986, 991 n. 2 (9th Cir.1991) ("Even assuming the depositions she lodged after filing her opposition were part of the record, Schneider's opposition to the renewed motion-on which judgment was entered and from which her appeal is taken-has no such references. Nor does it incorporate her prior opposition. Therefore, to the extent both the district court's tentative inclination to grant TRW's motion, expressed at the hearing on the original motion, and its ultimate decision, made after affording Schneider an opportunity to adduce more specific facts, was based on the absence of admissible evidence, it was correctly characterizing the record before it"); See also *L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561, 567 (7th Cir.1993) (stating that "a district court need not scour the record to determine whether there exists a genuine issue of fact to preclude summary judgment. Instead, the court can rely upon the non-moving party to show such a dispute if one exists"); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n. 8 (5th Cir.) (holding that the non-moving party must designate or refer to evidence in response to a motion for summary judgment for the evidence to be "part of the competent summary judgment record before the court," quoting *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988)), cert. denied, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the non-moving party sufficient to establish a genuine issue of material fact for trial"), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). Even were this not the case, plaintiffs concede that their job descriptions matched the work they performed. Consequently, they add nothing of substance to the evidence plaintiffs submitted concerning their daily responsibilities.

61. Hinds Decl., ¶ 6. Again, this description is in harmony with the job description earlier provided by EDS. The job description for Systems Administrator Seniors states:

"under broad direction, leads and coordinates the operational support and implementation activities for [client databases]. Assists leadership in determining tactical and strategic direction of the organization as it relates to emerging operational support technologies. Researches, analyzes, and recommends new operational support technologies, tools, and techniques. Coaches others on the application of new operational support technologies. Reviews distributed computing and network designs to select appropriate operational support strategies and ensure efficient use of resources. Conducts system support design and performance evaluation reviews. Identifies, develops, and updates operational support standards and procedures. Participates with corporate strategic planning teams. Keeps abreast of emerging operational support technologies and industry trends. Recommends price/performance improvement opportunities." *Id.*

As with the job description for database administrators, plaintiffs did not submit this job description for the court's consideration on summary judgment, but only Hinds' testimony regarding his actual daily responsibilities. Nonetheless, there is substantial overlap between the two.

62. Def.'s Facts, ¶¶ 18–19; Pl.'s Issues, ¶¶ 18–19.

implement new capacities for customers' databases to improve functionality as the customer needs.[63] EDS contends that they also (1) have broad discretion to plan projects, formulate solutions, and allocate their time and resources; (2) work with customers to determine their business requirements and develop or upgrade software to meet customers' needs; (3) gather and develop customer requirements and work with customers in an interactive and creative process to formulate solutions for future problems; and (4) exercise discretion in the creation of code to solve problems without creating new problems in the software or network.[64]

Plaintiffs dispute each of these assertions. As noted, Dwyre asserts that his discretion was limited. As concerns working with customers, Dwyre states that "most Information Analysts received their business requirements from other EDS employees," and that when he met with customers, he was always accompanied by "[o]ther senior EDS staff." [65] As for "gathering requirements" and working with customers to formulate solutions, Dwyre reports that he was given DOD's requirements and was responsible for "implementing and effectuating their policy." He states he was "never given the opportunity to 'make recommendations' about a[ ] new system," and that he "usually found out about such decisions after the fact." [66]

In addition to disputing EDS's description of the level of discretion and responsibility Information Analysts exercised, plaintiffs provide a detailed description of analysts' duties that EDS does not dispute. Dwyre states:

"My job was to create or modify a program to meet the business requirements of the customer. My job was highly technical and involved, under general direction, conceptualizing, designing, constructing, testing, and implementing portions of business and information technology solutions through application of appropriate software development life cycle methodology, interacting with the customer to gain an understanding of the business environment and the technical context, defining the scope, plans and deliverables for assigned projects, collecting, identifying, defining and organizing detailed user and information technology requirements, coordinating and collaborating with others in analyzing collected requirements to ensure plans and identified solutions met customer needs and expectations, confirming and projecting plans and deliverables with the customer, participating in technology solution implementations, upgrades, enhancements, and conversions, understanding and using appropriate tools to analyze, identify and resolve business and/or technical problems, applying metrics to monitor performance and measure key project criteria, preparing system documentation and staying current on emerging tools, techniques, and technologies, developing and maintaining data processing applications to [meet] customer business needs, coding, testing and implementing computer programs in development and maintenance modes, developing system and

63. Def.'s Facts, ¶ 23; Pl.'s Issues, ¶ 23.

64. Def.'s Facts, ¶¶ 20–22, 25.

65. Dwyre Decl., ¶ 14.

66. *Id.*, ¶ 16. Dwyre contends, in fact, that he was terminated by EDS for attempting to exercise independent judgment. Specifically, he asserts that he assigned a task to an Information Analyst on his team, only to be overruled by his program manager. When he questioned this "micro-management," he was terminated. (*Id.*)

programming specifications, design[ing] data processing solutions based on business needs and technical considerations, researching and resolving application production problems, monitoring application performance and performing run time improvement functions." [67]

### 4. The Named Plaintiffs

■ The named plaintiffs' declarations describe their job responsibilities. EDS, however, proffers deposition testimony by plaintiffs that it contends is in conflict with their declarations. To the extent this is true, plaintiffs' declarations cannot be used to create a genuine issue of material fact defeating summary judgment. See *United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 692 n. 10 (9th Cir.2006) ("Brown cannot create a genuine issue of material fact by submitting a contradictory declaration, which appears to be offered to avoid summary judgment"); *Silas v. Babbitt*, 96 F.3d 355, 358 (9th Cir.1996) ("One cannot create an issue of fact by simply contradicting one's own previous statement"); *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266–67 (9th Cir.1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony").

■ Where a party opposing summary judgment proffers a declaration that contradicts or seeks to explain earlier deposition testimony, the court must make a factual determination as to whether the declaration is an attempt to create a "sham" issue of fact and avoid summary judgment. *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266–67 (9th Cir.1991) (limiting the rule first articulated in *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543–44 (9th Cir.1975)). An affidavit is not a sham if (1) it "merely elaborat[es] upon, explain[s] or clarif[ies] prior testimony" (*Messick v. Horizon Indust., Inc.*, 62 F.3d 1227, 1231 (9th Cir.1995)); (2) if "the witness was confused at that time of the earlier testimony and provides an explanation for the confusion" (*Pacific Ins. Co. v. Kent*, 120 F.Supp.2d 1205, 1213 (C.D.Cal.2000) (citing *Kennedy*, 952 F.2d at 266)); or (3) if the declaration concerns newly discovered evidence (*id.*). Here, as noted below, plaintiffs' declarations do not "flatly contradict" their earlier deposition testimony, but rather explain or clarify that testimony.

### a. Heffelfinger

The parties dispute the proper interpretation of a number of Heffelfinger's state-

---

**67.** *Id.*, ¶ 7. Dwyre's description is also in harmony with the job description for "information analysts" earlier provided:

"under general direction, conceptualizes, designs, constructs, tests, and implements portions of business and technical information technology solutions through application of appropriate software development life cycle methodology. Interacts with the customer to gain an understanding of the business environment, technical context and organizational strategic direction. Defines scope, plans and deliverables for assigned projects. Collects, identifies, defines and organizes detailed user and information technology requirements. Coordinates and collaborates with others in analyzing collected requirements to ensure plans and identified solutions meet customer needs and expectations. Confirms and prioritizes project plans and deliverables with the customer. Participates in business and technical information technology solution implementations, upgrades, enhancements, and conversions. Understands and uses appropriate tools to analyze, identify and resolve business and/or technical problems. Applies metrics to monitor performance and measure key project criteria. Prepares system documentation. Establishes and maintains security, integrity and business continuity controls and documents. Participates in special studies, marketing efforts and formal proposals. Stays current on emerging tools, techniques, and technologies." Thierman Class Cert. Decl., Exh. E.

ments at deposition regarding his duties. For example, Heffelfinger stated that "we needed to determine where ... data was going to be housed, what database we were going to use to do it in, whether or not those databases needed to be upgraded to a new version to support the types of tasks they needed to do, and whether or not we needed to stand up a brand-new database to support this new application."[68] EDS asserts that Heffelfinger testified he "decided" these issues, while plaintiffs cite Heffelfinger's declaration, in which he contends he did not have ultimate decision-making authority.[69] EDS similarly asserts that Heffelfinger testified during his deposition that he "made decisions on behalf of the DOD as to when additional storage space should be purchased for the network."[70] In fact, Heffelfinger testified that he "told the system administrators when we needed more disk space, when we were running out of disk space for our stuff. So we need to buy more disks to house the database on or, you know, the server is running out of disk space."[71] This testimony suggests a reporting function rather than a decision-making function.[72] Consequently, the court views Heffelfinger's statement in his declaration that he did not "decide" issues a clarification or explanation of his deposition testimony rather than a contradiction.

In fact, Heffelfinger's deposition testimony is essentially consistent with his declaration. Heffelfinger testified, for example, that

"the high level guidance[ ] as to what direction we would go in was provided generally by [DMDC employees] and so I came up with what I would call the vision or strategic direction that were were to move in. And then my team was responsible for coming up with the strategic implementation or—I'm sorry—the tactical implementation of those strategic directives.... The hardware that we were to deploy was laid out for us. The—which containers were going to be stood up was already essentially decided for us. The URLs that were going to be used were already decided. We didn't make the final decisions on any of those things. What we did was provide technical input along the way, but the government made the final decision as to how things were going to be carried out."[73]

This testimony reinforces the undisputed fact that Heffelfinger (and other IT workers) exercised a certain degree of strategic and technical autonomy but left final decisions to the client.

**b. Dwyre**

Based on Dwyre's description of his role as technical team lead, EDS contends he (1) received high level tasks from the Project Manager (his supervisor); (2) figured out the scope of the project; (3) prioritized the order in which the work had to be done; (4) assigned tasks to team members; (5) reviewed their work; and (6) directed them to redo or fix it if it was done poorly.[74] Plaintiffs counter with cita-

---

**68.** Heffelfinger Depo. at 72:13–19.

**69.** Def.'s Facts, ¶ 88; Pl.'s Issues, ¶ 88. Here again, plaintiffs cite multiple paragraphs of Heffelfinger's declaration, but do not explain their significance. It is only on close examination of the declaration that it becomes clear plaintiffs dispute the notion that Heffelfinger "decided" these matters.

**70.** Def.'s Facts, ¶ 93.

**71.** Heffelfinger Depo. at 93:20–24.

**72.** The parties have similar disputes regarding the testimony of the remaining named plaintiffs.

**73.** *Id.* at 66:2–25.

**74.** Def.'s Facts, ¶ 132; see also Dwyre Depo. at 152:16–18 (stating that he "would get these high-level tasks from the project manager and then ferret it out into detailed tasks to assign to my program[m]ers"); *id.* at 145:19–20 ("I assigned programming tasks, I reviewed their

tions to Dwyre's declaration.[75]  In the declaration, however, Dwyre merely states that he "never hired or fired anyone" that "no [ ]one 'reported' to [him], and [that he] never conducted any performance evaluations." [76]  These statements do not directly contradict his deposition testimony or refute EDS's evidence.  As with Heffelfinger, it is clear that Dwyre describes a situation in which IT workers had some technical autonomy but had to work within the constraints of their client's policies and subject to the client's approval.

## 5.  Conclusion

Although the parties proffer a multitude of disputed and undisputed facts, the core of their disagreement is relatively simple.  The parties agree that class members perform an assortment of technical programming tasks, many of which require varying degrees of creativity, technical expertise, individual responsibility, and initiative.  The parties also appear to agree that class members advised EDS's clients, but that it was the clients themselves who made final decisions.  The parties primary dispute concerns how central class members' tasks were to the operation of their clients' business and how much discretion the workers exercised in performing those tasks.  This disagreement neatly tracks the legal question on which resolution of this case depends.  Indeed, reviewing the evidence, it is clear that the parties' real dispute concerns the legal import of class members' duties, not the extent or substance of those duties as a factual matter.

## II.  DISCUSSION

### A.  Legal Standard Governing Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED.R.CIV.PROC. 56(c).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case.  See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence.  Rather, it draws all in-

---

work"); *id.* at 148:18–25. (stating that he had discretion to, and did, transfer tasks from one team member to another, and communicated with team members when they did not do a good job).

**75.**  Pl.'s Issues, ¶ 132.

**76.**  Dwyre Decl., ¶ 13.

ferences in the light most favorable to the nonmoving party. See *T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987). The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). In addition, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979); see also *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985).

## B. California's Overtime Law and the Administrative Exemption

"California Labor Code § 510 requires overtime pay for any work over eight hours in one workday, over 40 hours in one workweek, or on the seventh day of work in one workweek subject to certain exceptions." *Sepulveda v. Wal–Mart Stores, Inc.*, 237 F.R.D. 229, 241 (C.D.Cal.2006). The Industrial Welfare Commission ("IWC") is empowered to create exceptions from these statutory overtime requirements for "executive, administrative, and professional employees, provided that the employee is primarily engaged in the duties that meet the test of the exemption, customarily and regularly exercises discretion and independent judgment in performing those duties, and earns a monthly salary equivalent to no less than two times the state minimum wage for full-time employment." CAL. LAB.CODE § 515(a).

The IWC exercised its authority to promulgate exceptions in Wage Order 4–2001. This order provides that, for the administrative exemption to apply,

> "[t]he employee must (1) perform 'office or non-manual work directly related to management policies or general business operations' of the employer or its customers, (2) 'customarily and regularly exercise[ ] discretion and independent judgment,' (3) 'perform[ ] under only

general supervision work along specialized or technical lines requiring special training' or 'execute [ ] under only general supervision special assignments and tasks,' (4) be engaged in the activities meeting the test for the exemption at least 50 percent of the time, and (5) earn twice the state's minimum wage." *Eicher v. Advanced Business Integrators, Inc.*, 151 Cal.App.4th 1363, 1371–72, 61 Cal.Rptr.3d 114 (2007) (citing 8 CAL. ADMIN. CODE § 11040(A)(2)(a)(I), (b), (d), (f)).

Because these elements are stated in the conjunctive, "each ... must be satisfied to find the employee exempt as an administrative employee." *Id.* at 1372, 61 Cal. Rptr.3d 114.

California's exemption has been construed in the same manner as the administrative exemption under the federal Fair Labor Standards Act ("FLSA"). See *Combs v. Skyriver Communications, Inc.*, 159 Cal.App.4th 1242, 1255, 72 Cal.Rptr.3d 171 (2008) (stating that California's administrative exemption "closely parallels the federal regulatory definition of the same exception," and citing 29 U.S.C. § 213(a)(1) ("any employee employed in a bona fide executive, administrative, or professional capacity" is exempt from the FLSA's minimum wage and hour requirements)); *id.* at 1256, 72 Cal.Rptr.3d 171 (noting that the federal regulations are "expressly incorporated in IWC Wage Order No. 4–2001"); see also *Medapalli v. Maximus, Inc.*, No. CIV. S–06–2774 FCD EFB, 2008 WL 958045, *5 (E.D.Cal. April 8, 2008) ("IWC Wage Order No. 4–2001 expressly incorporates certain regulations of the Federal Labor Standards Act ("FLSA") effective as of the date the wage order was issued"); 8 CAL.CODE REGS. § 11040(1)(A)(2)(f) ("The activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair

Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.201–205, 541.207–208, 541.210, and 541.215").

The Department of Labor has promulgated regulations defining the scope of exemptions under the FLSA. Its definition of "administrative capacity" is similar to that found in Wage Order No. 4–2001. See *Combs*, 159 Cal.App.4th at 1255, 72 Cal.Rptr.3d 171 ("Th[e] [federal] regulation provides, similarly to IWC Wage Order No. 4–2001, that a person 'employed in a bona fide *administrative capacity*' is an employee whose '*primary* duty' is 'the performance of *office or non-manual work directly related to the management or general business operations of the employer or the employer's customers,*'" quoting 29 C.F.R. § 541.200(a)(2) (emphasis original)).[77] Unlike the Wage Order, however, the federal regulations include interpretative guidelines that explain the terms they use. 29 C.F.R. § 541.201, for example, "is devoted entirely to explaining the meaning of the phrase 'directly related to management policies or general business operations,' a phrase used in the administrative exemption provisions of [the Wage Order]." *Id.* Section 541.201 provides that "[t]o qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.201(a).[78] It distinguishes between work "directly related to assisting with the running or servicing of the business … [and] work[ ] on a manufacturing production line or selling a product in a retail or service establishment." *Id.*

Courts interpreting this language have emphasized that "[e]mployees who work as advisors and consultants to an employer's customers may qualify for the administrative exemption." *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 598, 2008 WL 818617, *11 (E.D.Cal.2008); see *id.* ("The regulations interpreting the

77. The *Combs* court recognized that "[e]ffective August 23, 2004, the DOL revised the FLSA's implementing regulations governing certain exemptions from the FLSA's minimum wage and overtime pay requirements, including the exemption for any employee employed in a bona fide administrative capacity." *Combs*, 159 Cal.App.4th at 1255 n. 5, 72 Cal.Rptr.3d 171. Although the Wage Order references the earlier federal regulation, the *Combs* court expressly adopted the interpretation set forth in the new regulations. This decision is supported by the preamble to the amended regulations as proposed, in that it stated that the amendments were not meant to effect any substantive change in the exemptions. See *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 295 n. 7 (4th Cir.2007) ("This interpretation is strengthened by the fact that the preamble to the proposed amended regulations state that the changes were made 'to simplify and update the current regulations' [quoting 58 Fed.Reg. 15,560, 15,573 (Mar. 31, 2003)], not to effect a major alteration in how exemptions are construed").

Plaintiffs concede that the federal regulations can be used as interpretive aids; they argue, however, that, because they do not plead federal claims, the federal exemptions do not apply. (Pl.'s Opp. at 12 n. 9.) Plaintiffs are, of course, correct that federal exemptions do not apply to their state claims. Because the Wage Order explicitly incorporated federal regulations interpreting the parallel federal exemption, however, and because *Combs* and other cases have looked to the federal regulations in applying California law, plaintiffs' distinction is without real substance. Indeed, plaintiffs tacitly accept the interpretive authority of the federal regulations, drawing on federal cases that analyze the FLSA's administrative exemption throughout their brief.

78. This language is similar to that found in the California regulations, which exempt employees who are primarily engaged in the "performance of work directly related to the management policies or general business operations of [their] employer or [their] employer's customers." 8 Cal.Code Regs. § 11040(1)(A)(2) (a)(i).

Wage Orders expressly contemplate[ ] that 'many persons employed as advisory specialists and consultants of various kinds [including] ... tax experts' may qualify for the exemption"); *Gallegos v. Equity Title Co. of America, Inc.,* 484 F.Supp.2d 589, 594 (W.D.Tex.2007) ("The test of 'directly related to management policies or general business operations' is met by many persons employed as advisory specialists and consultants of various kinds, credit managers, safety directors, claim agents and adjusters, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion men, and many others," citing 29 C.F.R. § 541.205(c)(1)); *LaCourse v. GRS III, L.L.C.,* No. 05–75613, 2006 WL 3694623, \*17 (E.D.Mich. Dec. 13, 2006) ("The regulations specifically recognize that sometimes a company contracts its employees out to work at another company's facility. Such employees may qualify as exempt administrative employees by doing work related to the general business operations of the company at which they are assigned").

The regulations identify certain categories of work that constitute "work directly related to management or general business operations." Such work

"includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; *computer network, internet and database administration;* legal and regulatory compliance; and similar activities." *Id.,* § 541.201(b) (emphasis added).

The federal regulations' interpretive guidance regarding "exercise of discretion and independent judgment with respect to matters of significance" is also expressly incorporated in the Wage Order. See *Combs,* 159 Cal.App.4th at 1256, 72 Cal. Rptr.3d 171 (citing 29 C.F.R. § 541.202(a) & 8 CAL.CODE REGS. § 11040(1)(A)(2)(f)). The regulation explains that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." *Id.* In addition to these definitions, § 541.202(b) provides a non-exhaustive list of factors to be considered in determining whether a given employee exercises discretion or independent judgment. While the regulations require that "discretion and independent judgment" be evaluated "in light of all the facts involved in the particular employment situation ...," certain of the factors identified are relevant here: (1) "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;" (2) "whether the employee carries out major assignments in conducting the operations of the business;" (3) "whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;" (4) "whether the employee provides consultation or expert advice to management;" and (5) "whether the employee investigates and resolves matters of significance on behalf of management." 29 C.F.R. § 541.202(b).[79]

---

**79.** The section reads in full as follows:

"The phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining

The regulations also address whether an employee can exercise discretion and independent

judgment even if he or she lacks final decision-making authority. Section 541.202 states: "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment." 29 C.F.R. § 541.202(c).

In this context, the regulations specifically provide that a management consultant who has "made a study of the operations of a business and who has drawn a proposed change in organization" is exempt despite the fact that his plan is subject to review and revision by his superiors before it is submitted to the client. *Id.*

The regulations also indicate what does not constitute the exercise of "discretion and independent judgment." The employee must do "more than ... use [his] skill in applying well-established techniques, procedures or specific standards described in manuals or other sources.... [or] perform[ ] other mechanical, repetitive, recurrent or routine work." 29 C.F.R. § 541.202(e).

In addition to administrative employees, California exempts workers in the computer software field who are paid on an hourly basis if they meet the following criteria: (1) they are primarily engaged in work that is intellectual or creative requiring the exercise of discretion and independent judgment; (2) they are primarily engaged in the application, design, analysis, testing, or creation of computer programs; (3) they are highly skilled and proficient in the theoretical and practical application of specialized information to computer systems; and (4) their hourly rate of pay is not less than a statutorily set minimum which is adjusted yearly to accommodate inflation. *See* CAL. LAB.CODE § 515.5;8 CAL.CODE REGS. § 11040(1)(A)(3)(h). EDS argues that

whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact;

whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." 29 C.F.R. § 541.202(b).

some portion of the putative class falls under either of the administrative and computer software exemptions.

■■■■ California's overtime statutes are remedial in nature. Thus, exemptions are interpreted narrowly to protect employees. See *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal.4th 785, 794, 85 Cal.Rptr.2d 844, 978 P.2d 2 (1999) ("under California law, exemptions from statutory mandatory overtime provisions are narrowly construed"); *Eicher*, 151 Cal.App.4th at 1374, 61 Cal.Rptr.3d 114 ("The command to interpret exemption statutes narrowly to protect employees leads us to believe such an expansive interpretation is not appropriate"). Furthermore, reliance on an exemption is an affirmative defense, such that the employer bears the burden of proving the employee is exempt. See *Ramirez*, 20 Cal.4th at 794–95, 85 Cal.Rptr.2d 844, 978 P.2d 2.

### C. The Administrative/Production Worker Dichotomy

Plaintiffs rely heavily on the concept, present in both the federal and state law, of a dichotomy between administrative and production employees. This dichotomy was recognized by the California Court of Appeal in *Bell v. Farmers Ins. Exchange*, 87 Cal.App.4th 805, 820, 105 Cal.Rptr.2d 59 (2001), which stated that "[t]hough it offers a broad distinction demanding further refinement in some cases, the administrative/production worker dichotomy, as elucidated by federal decisions, has proven to be a useful approach." *Bell* noted that the dichotomy was well-established in federal law, and distinguished administrative employees—"who are usually described as employees performing work 'directly related to management policies or general business operations of his employer or his employer's customers' "—from production

employees—"who have been described as 'those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce.' " *Id.*

In *Bell*, a class of insurance claims representatives sued their employer for unpaid overtime, and defendant countered that they were exempt administrative employees. The court held that, as claims representatives, plaintiffs performed the "sole mission" of the offices where they worked. Consequently, it concluded that they were production workers. See *id.* at 826, 105 Cal.Rptr.2d 59 ("Our review of the undisputed evidence places the work of the claims representatives squarely on the production side of the administrative/production worker dichotomy. The undisputed evidence establishes that claims adjusting is the sole mission of the 70 branch claims offices where the plaintiffs worked. The claims representatives are fully engaged in performing the day-to-day activities of that important component of the business"). Although acknowledging that "the administrative/production worker dichotomy is a somewhat gross distinction that may not be dispositive in many cases," and that in some cases claims representatives might perform work that qualified as administrative, the court relied on the employer's description of the decisions plaintiffs made as "routine and unimportant," and concluded that their status as production workers placed them outside the administrative exemption to California's overtime law. See *id.* at 827–28, 105 Cal. Rptr.2d 59.

State and federal courts following *Bell* have grappled with how much weight, if any, to ascribe to the dichotomy under California law. Plaintiffs rely principally on two cases applying the dichotomy to similar facts. The first of these is *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120 (9th Cir.2002).[80] Bothell was an engineer who

---

**80.** Notably, there were no state claims in *Bot-*

*hell,* and the court's discussion was limited to

worked for Phase Metrics, a company that designed, manufactured, and sold robotic test and inspection equipment. *Id.* at 1122–23. Bothell sued the company for unpaid overtime, and Phase Metrics asserted that he was an exempt administrative employee. The district court utilized the dichotomy between administration and production workers in analyzing the claim; it found that Bothell's work was "ancillary" to Phase Metric's main activities and thus that he was an administrative rather than a production worker. See *id.* at 1126. The Ninth Circuit noted that the dichotomy "is useful only to the extent that it helps clarify the phrase 'work directly related to the management policies or general business operations'" of the company or a customer. *Id.* (quoting *Webster v. Public School Employees of Washington, Inc.,* 247 F.3d 910, 916 (2001)). It cautioned, therefore, that it should be employed as an analytical tool "only to the extent it clarifies the analysis." *Id.* at 1127; see *id.* ("Only when work falls 'squarely on the 'production' side of the line,' has the administration/production dichotomy been determinative," quoting *Reich v. State of New York,* 3 F.3d 581, 587–88 (2d Cir. 1993)).

Indeed, the court *rejected* the district court's invocation of the dichotomy, and looked directly to the regulations in analyzing the nature of Bothell's employment. It determined that evidence in the record supported the conclusion that Bothell was a "highly skilled repairman who, rather than traveling from job-site to job-site, was assigned to a specific facility and charged with keeping its equipment in good working order." *Id.* at 1128. "If Bothell was essentially a repairman," the court stated, "then he did not engage in 'running the business itself or determining its overall course or policies.'" *Id.* (quoting *Bratt v. County of Los Angeles,* 912 F.2d 1066,

1070 (9th Cir.1990)); see *id.* ("In short, Bothell's work should not be labeled 'administrative' merely because Phase Metrics chose to provide on-site customer service to a few select customers, rather than as a separate product line. A fact-specific inquiry is needed"). Although *Bothell* discussed the dichotomy, therefore, the Ninth Circuit ultimately did not use it in deciding whether Bothell was exempt.

Plaintiffs also rely heavily on *Eicher* which, unlike *Bothell,* applied the dichotomy under California law. In *Eicher,* the court considered whether a consultant for a software company, who provided customer service and training on specialized software to clients, was properly exempted from state overtime requirements. After noting *Bell*'s caution that the dichotomy is necessarily not determinative, and that "a careful analysis of the employees' duties may be necessary to determine exempt or nonexempt status in other cases," it concluded that Eicher performed the core, day-to-day business of his employer, ABI. Specifically, it found that he "implement[ed] the ABI MasterMind product at customer venues and support[ed] the customers, whether at the customer venues or in the ABI office." *Eicher,* 151 Cal. App.4th at 1373, 61 Cal.Rptr.3d 114. As a result, the court concluded, Eicher's duties "were comparable to those of the claims representatives in *Bell.*" *Id.* Although Eicher had to learn his customers' management policies and business operations to perform his work, he did so "only to implement the software in the most beneficial way for the customers and not to participate in policy-making or alter the general operation of the business." *Id.* Consequently, the court held, he was essentially a production employee because he performed the work ABI was hired to do for its customers. See *id.* Although the court noted that Eicher often served as

application of the dichotomy under federal law.

ABI's "point person" with clients, it concluded that he was not exempt because he "engaged in the core day-to-day business of ABI" and "had no personal effect on the policy or general business operations of ABI or its customers." *Id.* at 1375, 61 Cal.Rptr.3d 114.

Although *Bell* and *Eicher* indicate that the dichotomy can assist to some extent in analyzing the nature of a particular worker's employment, other cases express greater skepticism regarding its utility. In *Combs*, decided after *Eicher*, the Fourth District Court of Appeal examined the applicability of the dichotomy in cases involving information technology workers. The defendant in *Combs* was a wireless internet provider. Combs, the plaintiff, was responsible for "maintaining the well being of the network." *Combs*, 159 Cal. App.4th at 1247, 72 Cal.Rptr.3d 171. He sued challenging his exempt classification. After a bench trial, the court found for defendant. See *id.* at 1249–50, 72 Cal. Rptr.3d 171.

The appeals court began its analysis by noting that the *Bell* court had "strongly admonished ... that the ... dichotomy [might] not be dispositive in many cases involving a claim of administrative exemption, and in fact warned that the dichotomy should be applied with great caution." *Id.* at 1260, 72 Cal.Rptr.3d 171. It observed additionally that the *Bell* "court's creation of the administrative/production worker dichotomy was necessitated by the fact that former IWC Wage Order No. 4 lacked any reference to [the] applicable federal regulations, and also lacked the detailed definition of the administrative exemption now found in IWC Wage Order No. 4–2001." *Id.* The court held there was no need to

utilize the dichotomy as an analytical tool because the amended Wage Order "expressly incorporate[d] applicable federal regulations and set[ ] forth a set of specific elements that, if proved, [would] establish that an employee is a 'person employed in an administrative capacity' for purposes of the administrative exemption set forth therein." *Id.* at 1260–61, 72 Cal.Rptr.3d 171. The court also noted that "the wide variations in Combs's job responsibilities called for 'finer distinctions than the ... administrative/production worker dichotomy provides.' " *Id.* at 1261, 72 Cal. Rptr.3d 171. Thus, it utilized the specific elements outlined in the state and federal regulations to determine whether plaintiff was exempt. Specifically, it examined whether: (1) plaintiff's work was directly related to [his employer's] management policies or general business operations; (2) plaintiff exercised discretion and independent judgment; and (3) his job duties took up more than half of his day.[81] *Id.* at 1263, 72 Cal.Rptr.3d 171.[82]

*Combs* did not involve an employee working for an external client. Courts examining such situations have declined to utilize the dichotomy because both California and federal regulations specifically state that consultants may be exempt. See *Campbell*, 253 F.R.D. at 599 n. 10, 2008 WL 818617 at * 11 n. 10 (noting the language of the federal and state regulations, and concluding that "plaintiffs' reliance on the administrative/production worker dichotomy is less than helpful"). Noting that the regulations identify a tax consultant as one type of worker who qualifies for the administrative exemption, the *Campbell* court remarked upon the manner in which this example

---

**81.** Section 11040(2)(N) provides that the term "primarily" as used in the administrative exemption means "more than one-half the employee's work time." 8 Cal.Code Regs. § 11040(2)(N).

**82.** As discussed *infra,* the court concluded that plaintiff's duties satisfied all of these requirements and thus that he was exempt from California's overtime laws.

"blur[red] th[e] dichotomy [between administrative and production workers.] The tax consultant's work directly relates to the client's business operations, but the tax consultant's duties also relate to producing the commodity of his or her enterprise, tax advice. Similarly, an auditor's work directly relates to the client's business operations, but the commodity of the auditor's enterprise is audit advice." *Id.*[83]

*Campbell* stands for the proposition that consultants or outside contractors do not fall outside the administrative exemption simply because they provide the service their company is hired to provide; rather, to the extent their work involves the management policies or general business operations of their employer's clients, they are squarely within the regulatory definition of an administrative employee. See *Webster*, 247 F.3d at 916 (noting that a "sensible application of the administrative work/production dichotomy" supported a finding that a labor union field representative, who assisted bargaining units who were his employer's clients negotiate collective bargaining agreements, was engaged in administrative work, because "the purpose of the dichotomy is to clarify the meaning of 'work directly related to the management policies or general business operations,' not to frustrate the purpose and spirit of the entire exemption").

As *Combs* and *Campbell* reflect, the dichotomy is often of limited use outside of the manufacturing context in which it was devised. See *Roe–Midgett v. CC Services*, 512 F.3d 865, 872 (7th Cir.2008) ("[T]he so-called production/administrative dichotomy—a concept that has an industrial age genesis—is only useful by analogy in the modern service-industry context. 'The typical example of the … dichotomy is a factory setting where the 'production' employees work on the line running machines, while the administrative employees work in an office communicating with the customers and doing paperwork,' " quoting *Shaw v. Prentice Hall Computer Publ'g Inc.*, 151 F.3d 640, 644 (7th Cir.1998)); *Savage v. UNITE HERE*, No. 05 Civ. 10812(LTS)(DCF), 2008 WL 1790402, *7 (S.D.N.Y. Apr. 17, 2008) ("[C]ourts have recognized that the administration/production dichotomy is merely illustrative—unless the work falls squarely on the production side—and may be of limited assistance outside the manufacturing context," citing cases); see also *Kohl v. Woodlands Fire Dept.*, 440 F.Supp.2d 626, 636 (S.D.Tex.

---

**83.** This conclusion finds direct support in the regulations, which, as noted, state that

> "[a]n employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt." 29 C.F.R. § 541.201(c).

That the administrative exemption applies to contractors is also clear from subsection (a), which states specifically that an employee can qualify for the administrative exemption if his or her "work [is] directly related to the management or general business operations of the employer or the *employer's customers.*" 29 C.F.R. § 541.201(a). At the hearing, plaintiffs suggested that the duties listed in § 541.201(b) do not apply to contractors because, unlike subsections (a) and (c), subsection (b) does not mention "customers." This argument fails. Subsection (a) states that work may be "directly related" to the management or general business operations of either the employer or the employer's customer. Subsection (b) identifies the type of work that is "directly related," whether done for the the employer or a customer. Subsection (c) confirms this reading, reinforcing the notion that consultants who are perform work that is "directly related" to the management or general business operations of a client may be administratively exempt.

2006) ("The analytic difficulty of applying the 'production/administration' distinction has led some courts to question whether the dichotomy is analytically helpful in the context of modern service industries.... The revised 2004 Department of Labor regulations have moved away from this dichotomy in the context of service industries"). The work at issue in this case is far removed from the "manufacturing context" in which the dichotomy was devised. This observation supports the admonition in *Bothell* that the dichotomy is "but one analytical tool, to be used only to the extent it clarifies the analysis." *Bothell*, 299 F.3d at 1127.

This appears to be true in the present case. This case does not involve the traditional manufacturing context in which the dichotomy was developed. Rather, as in *Campbell*, the workers in question function effectively as consultants, assisting their clients in the design and implementation of software systems. As a result, the court heeds the admonition of the *Bothell*, *Eicher* and *Bell* courts that the dichotomy is not determinative, and should be used only to the extent it helps clarify application of the controlling regulations. The court is also mindful of *Combs'* caution that the *Bell* court created the dichotomy because the version of the Wage Order it applied did not incorporate federal regulations or identify specific factual elements that are hallmarks of administrative work. As the

current Wage Order does both these things, the court must closely analyze the duties of the IT workers who are class members under the Wage Order and the federal interpretive regulations it incorporates.

### D. Whether the Class Members are Exempt

To prevail on its motion for summary judgment, EDS must prove (1) that class members' duties and responsibilities involve "[t]he performance of office or non-manual work directly related to the management policies or general business operations of [EDS] or [EDS's] customers" (8 CAL.CODE REGS. § 11040(1)(A)(2)(a) (I)); (2) that they "customarily and regularly exercise[ ] discretion and independent judgment" (*id.* § 11040(1)(A)(2) (b)); (3) that class members "perform[ ] under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge" (*id.* § 11040(1)(A) (2)(d)); and (4) that they are " 'primarily engaged in duties that meet the test of the exemption' as those activities are construed in the FLSA regulations incorporated in IWC Wage Order No. 4–2001.' " *Combs*, 159 Cal.App.4th at 1251, 72 Cal.Rptr.3d 171 (quoting 8 CAL.CODE REGS. § 11040(1)(A)(2)(f)).[84] As noted, each of these elements must be satisfied before an employee will be found to be exempt. See *Eicher*, 151 Cal.App.4th at 1372, 61 Cal.

---

**84.** The *Combs* court referred to these factors as the "duties test." See *Combs*, 159 Cal. App.4th at 1251, 72 Cal.Rptr.3d 171. There is also a "salary test," which requires a showing that the employee "earn[ed] a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment." *Id.;* see also 8 CAL CODE REGS. § 11040(1)(A)(2)(g). In *Eicher*, the court combined the "duties test" and the "salary test." See *Eicher*, 151 Cal.App.4th at 1371, 61 Cal.Rptr.3d 114 ("The employee must (1) perform "office or non-manual work directly related to management policies or general business operations" of the employer or its customers, (2) "customarily and regularly exercise[ ] discretion and independent judgment," (3) "perform[ ] under only general supervision work along specialized or technical lines requiring special training" or "execute [ ] under only general supervision special assignments and tasks," (4) "be engaged in the activities meeting the test for the exemption at least 50 percent of the time, and earn twice the state's minimum wage"). There is no dispute in this case that the "salary test" is met.

Rptr.3d 114 ("Stated in the conjunctive, each of the ... elements must be satisfied to find the employee exempt as an administrative employee").

### 1. Office or Non–Manual Work Directly Related to the Management Policies or Business Operations of EDS or its Customers

As noted, there is no disagreement that class members perform office or non-manual work.[85] What *is* disputed is whether their work is "directly related to the management policies or business operations" of EDS's customers. Plaintiffs' argument on this point merges with their argument respecting the administrative/production work dichotomy. Plaintiffs assert that EDS "has the burden on summary judgment of proving that there is no genuine issue of material fact that Class members are *not* production employees, i.e., it must prove that the primary duty of Class members is *not* to produce the goods or services that EDS exists to produce."[86] For the reasons stated above, the court concludes that this is the wrong standard to apply. The question is not whether class members are "production" employees, but rather whether their work is directly related to the management policies or business operations of EDS's customers.[87]

In assessing what constitutes work "directly related to management policies or business operations" of EDS's clients, California law directs courts to the federal interpretive regulations. The state regulations incorporate 29 C.F.R. § 541.201(a), which "provides that the phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee." *Combs*, 159 Cal.App.4th at 1264, 72 Cal. Rptr.3d 171. Such work "includes, but is not limited to, work in functional areas such as ... computer network, internet and database administration." 29 C.F.R. § 541.201(b).[88]

---

85. Def.'s Facts, ¶ 144; Pl.'s Issues, ¶ 144.

86. Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp. at 15.")

87. The law is clear, and the parties agree, that class members can qualify as exempt if their work relates to the management policies or business operations of EDS's clients as opposed to EDS itself.

88. This regulation clearly states that "database administration" is the kind of work that qualifies as "directly related to the management policies or general business operations" of a company. At the hearing, plaintiffs cited the *Bothell* court's statement that work is "directly related" to management policies or business operations when "the employee engages in 'running the business itself or determining its overall course or policies,' not just in the day-to-day carrying out of the business' affairs." *Bothell*, 299 F.3d at 1125 (quoting *Bratt*, 912 F.2d at 1070). Using this definition, the court concluded that repair work was not "running the business itself." *Id.* at 1128. Plaintiffs argue, based on *Bothell*, that unless they were "running the business" of, e.g., the Department of Defense, or "determining its overall ... policies," they cannot be deemed to have performed work directly related to management policies or general business operations. They contend that database administration is not work of this type. The court disagrees. The list of duties set forth in § 541.201(b) are tasks that are properly considered to be integral to "running the business" as that term is used in *Bothell*. Thus, they are "directly related" to management policies and general business operations as those terms are used in the regulation.

The federal regulations emphasize this point in explaining the intersection between the computer employee exemption and the administrative exemption. They state:

"For example, systems analysts and computer programmers generally meet the duties requirements for the administrative exemption if their primary duty includes work such as planning, scheduling, and coordinating activities required to develop systems to solve complex business, scientific or engineering problems of the employer

California Courts that have addressed the question have held that employees engaged in network, internet or database administration performed work "directly related to management policies or business operations." In *Combs*, for example, the court noted that Combs' job consisted, *inter alia*, of "maintaining the well being of [his employer's] network." *Combs*, 159 Cal.App.4th at 1265, 72 Cal.Rptr.3d 171. Although Combs performed other listed in § 541.201(b), the court based its conclusion regarding the administrative nature of his job in part on Combs' involvement in network administration. *Id.*[89]

■ The California Court of Appeal, in an unpublished decision, reached a similar conclusion on facts that closely parallel this case. The plaintiff in *Paul v. One Touch Technologies Corp.*, No. G037407, 2007 WL 1786259 (Cal.App.2007) (Unpub.Disp.), was employed by One Touch, "a 'designer, creator[,] . . . installer and service company for electronic medical records.'" *Id.* at *1.[90] Paul served "as a consultant and 'advisory specialist' to [One Touch's] clients, in which capacity he assisted in the development and configuration of software for [One Touch's] clients and continually advised on how to func-

tionally integrate it into their computer systems. . . . [Paul's] responsibilities [included] configuring the settings for the customers' Information Technology (IT) environments, each of which was unique. . . ." *Id.* at *4. In holding that Paul's work was "directly related to management policies and business operations," the *Paul* court emphasized § 541.201(b)'s reference to "computer network, internet and database administration." *Id.* at *3.

Even courts that have not cited the regulation have generally held that employees who perform tasks similar to those performed by class members here engaged in work that was "directly related to management policies and business operations." Notably, in *Booth v. Electronic Data Systems*, 799 F.Supp. 1086 (D.Kan.1992), plaintiff was an EDS employee who worked in the systems engineering development program. The district court found, without analysis, that because plaintiff's "ultimate function as a systems engineer was to assist EDS customers . . . [he] was at all times an exempt administrative employee, not entitled to overtime compensation." *Id.* at 1093–94. Similarly, in *Horne v. Singer Business Machines, Inc.*, 413 F.Supp. 52 (W.D.Tenn.1976), the court

or the employer's customers." 29 C.F.R. § 541.402.

Stated differently, when computer employees like plaintiffs coordinate systems to solve a customer's computer problems, their work is administrative. Given the specificity of this language, plaintiffs' appeal to *Bothell*'s broader "running the business" formulation is unavailing. Plaintiffs do not argue, nor could they, that *Bothell* articulated a standard distinct from the regulations it was interpreting. Those regulations are quite clear that work of the type plaintiffs performed is "directly related" to management policies or general business operations.

89. Combs' duties also included " 'budgeting,' 'purchasing,' [and] 'procurement.' . . ." *Combs*, 159 Cal.App.4th at 1265, 72 Cal. Rptr.3d 171.

90. Plaintiffs argue that the court should not consider *Paul* because it was an unpublished decision and because California prohibits the citation of such decisions. The law in this circuit is different. "Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05–313 VRW, 2005 WL 2893865, *3 (N.D.Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir.2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

found that a plaintiff, who "modified given computer systems to meet the specific needs of individual customers with whom he consulted," and spent time "debugging" and explaining the computers to customers, was an administrative employee exempt from the FLSA's overtime provisions. See *id.* at 53–54.

Plaintiffs cite *Eicher* as supporting a contrary conclusion. Eicher was not a computer scientist; rather, he "primarily provided customer service and training on the ABI MasterMind software." *Eicher,* 151 Cal.App.4th at 1370, 61 Cal.Rptr.3d 114. The trial court found that Eicher "devoted the majority of his work time in training customer employees on Master-Mind and trouble shooting the software when he was engaged in implementation on the customer's site." *Id.* There is no suggestion that Eicher wrote, designed, or maintained the software. Indeed, comparing Eicher to the plaintiff in *Levie v. AT & T Communications, Inc.,* CIV. A. No. 1: 88–CV–2132–RLV, 1990 WL 61174 (N.D.Ga.1990), the *Eicher* court observed that Eicher had less authority than that Levie because unlike Eicher, Levie "coordinated, designed, and implemented projects, not only working with the customers but also identifying impacts and designing and coordinating project teams." *Eicher,* 151 Cal.App.4th at 1374, 61 Cal.Rptr.3d 114. Thus, while Eicher was employed by a software company to service software for its clients, he was not a programmer and was not responsible for designing or implementing software systems.[91]

Plaintiffs also analogize to *Bothell.* There, as noted, plaintiff was an engineer for a robotics company. The court found that his evidence, if true, "could support the finding that he was a highly skilled repairman[,] . . . the high-tech equivalent of the Xerox machine man who meets and confers with customers to identify the problem, diagnoses the malfunction, formulates a work plan, repairs the equipment based on procedures established by the manufacturer. . . . His primary duty was to install, troubleshoot, and maintain Max Media equipment." *Bothell,* 299 F.3d at 1128. Bothell himself stated that his "primary duties were to keep Phase Metric's equipment in good working order," and reported that he spent his time "troubleshooting and maintaining the existing machines." *Id.* at 1124. As in *Eicher,* nothing in *Bothell* suggests that plaintiff there was responsible for writing software code or maintaining networks or databases. Instead, he was responsible for maintaining hardware—work that may be technical, but that is categorically different than the work performed by the class members here.

Finally, plaintiffs cite *Martin v. Indiana Michigan Power Co.,* 381 F.3d 574, 582 (6th Cir.2004). There, Martin was employed by the defendant as an "IT Support Specialist," which defendant identified as an exempt position. *Id.* at 576. The court described Martin's duties as follows:

"When people at the plant have problems with their computers, they call the

---

**91.** At the hearing, plaintiffs argued that *Eicher* drew a distinction between employees who are engaged in the "core day-to-day business" of the employer or its customer and employees who have a "personal effect on the policy or general business operations of [the employer] or its customers." *Eicher,* 151 Cal. App.4th at 1375, 61 Cal.Rptr.3d 114. As with the language plaintiffs cited in *Bothell,* this passage from *Eicher* merely restates the "di-rectly related" test set forth in the regulations; it does not limit or alter it. In the face of regulatory language that defines database administration as "directly related" to the management or general business operations of an employer or its customers, the court declines plaintiffs' invitation to ignore the regulations and focus instead on *Eicher*'s formulation of the test.

help desk where the help desk employees put the problems into a database as 'help desk tickets,' which Martin prints out. Martin responds to these help desk tickets. He goes to the location indicated where he attempts to determine the nature of the problem, to 'troubleshoot' it to determine how to proceed, and to repair the problem if possible. Martin installs software, such as Microsoft's Office 97, on individual workstations. He troubleshoots Windows 95 problems and installs provided software patches." *Id.* at 577.

As his supervisor described it, Martin worked in a "maintenance organization that takes care of computer systems." *Id.* at 576. Analyzing whether such work was "directly related to management policies or business operations," the court noted that defendant's only argument in support of such a finding was that Martin did not perform production work, and that under the dichotomy, his work must be categorized as administrative. See *id.* at 582. Noting that it had "rejected the argument that all work that is not production work is automatically 'directly related to management policies or general business operations of the employer,'" the court concluded that Martin essentially performed maintenance duties and thus that his work was not exempt. See *id.* ("Martin's job, instead, is to assist in keeping the computers and network running to the specifications and designs of others").

█ Comparing *Eicher, Bothell,* and *Martin* with *Combs, Paul,* and the federal regulations, a clear demarcation point emerges. In *Eicher, Bothell* and *Martin,* plaintiffs were tasked to install, maintain, and troubleshoot software. They were not charged with writing code, programming, or "administering" databases or networks.

It is undisputed that class members in this case perform all of these tasks. Dwyre, for example, testified that his job duties included, *inter alia,*

"computer programming of business applications, ... conceptualizing, designing, constructing, testing and implementing portions of business and information technology solutions through application of appropriate software development life cycle methodology, interacting with the customer to gain an understanding of the business environment and the technical context, ... [and] design[ing] data processing solutions based on business needs and technical considerations." [92]

Heffelfinger was a "database administrator," whose job responsibilities included "the design and integrity of database structures in a multi-user environment, developing and enforcing database standards and procedures, leading or participating in logical and physical database design, ... monitoring database performance statistics and recommending improvements, advising systems engineers and updating management on database concepts and techniques, and researching new database technologies." [93]

Hinds was a "Senior Systems Administrator," who "essentially maintained and managed the 'Oracle' database application"; he noted that this was "the kind of work commonly performed by database administrators." [94] In sum, it is undisputed that class members engaged in programming, design, and administration of their customers' databases to varying degrees. Heffelfinger's and Hinds' job classifications described them as systems or database "administrators," a type of ad-

92. Dwyre Decl., ¶ 7.

93. Heffelfinger Decl., ¶ 6.

94. Hinds Decl., ¶ 6.

vanced work that the federal regulations explicitly provide is "directly related to management policies and business operations." [95]

The applicable case law recognizes the distinction as well. The employees in *Combs* and *Paul*, who were explicitly charged with developing and administering computer systems, fell within the administrative exemption. By contrast, the employees in *Eicher*, *Bothell*, and *Martin*, who were tasked only with installing and troubleshooting computer systems, were not exempt. Plaintiffs have cited no case in which an employee whose responsibilities included designing, conceptualizing or administrating a database or computer network was found *not* to be engaged in work that was "directly related to management policies or business operations."

In short, given plaintiffs' undisputed declaration testimony, the federal regulations, and the case law, the court concludes there is no triable issue regarding the fact that class members' duties were "directly related to the management policies or general business operations of [EDS] or [EDS's] customers" (8 Cal.Code Regs. § 11040(1)(A)(2)(a)(I)). The first element

of the four part test for exemption is therefore met.

## 2. Whether Class Members Customarily and Regularly Exercise Discretion and Independent Judgment

The parties' other major dispute concerns the extent to which class members exercise discretion. Each of the named plaintiffs testified that he exercised little discretion and did not have independent decision-making authority. Dwyre stated that "[a]ny 'discretion or independent judgment' [he] had in my job (1) was minor and supervised and (2) was limited for the most part to technical issues." [96] Heffelfinger testified that "[t]here was no discretion in the work [he] performed on matters ... directly related to the management or general business operations of EDS or its customers." He asserted that he "was bound by DOD regulations, the terms of EDS's contract with the DOD, and the legal requirement to submit to government guidance for all technical matters. This severely restricted [his] ability to use independent judgment in [the] job." [97] Hinds echoed this, noting that "[i]n performing my duties for EDS, [he]

---

95. At the hearing, plaintiffs cited the deposition testimony of Jennifer Miner, EDS's United States Compensation Manager. Miner testified that she did not know of an instance in which a decision made by a class member impacted an EDS customer. (Pl.'s Issues, ¶¶ 161, 195.) Miner's lack of knowledge does not mean that no such instance exists. Miner worked at EDS's headquarters in Texas and was not familiar with the specific duties performed by the named plaintiffs. (See Pl.'s Issues, ¶ 158.) She did not state that class members did not make decisions that impacted EDS customers, or that they did not exercise discretion. She simply testified that she was not aware of a specific instance in which a class member made such a decision or exercised discretion. Miner testified that she was not familiar with what "really happened" on the job because she did not "have personal knowledge of individuals." (Declaration of

Eric M. Epstein in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Epstein Decl."), Exh. D (Deposition of Jennifer Miner ("Miner Depo.")) at 52:17–18.) Thus, when later asked for a specific example of how an IT worker's decision "impacted a specific customer of EDS," she was compelled to say that she knew of none. (*Id.* at 95:11–14.) Because Miner is not familiar with the day-to-day tasks performed by class members, she could not provide specific instances of decision-making. Miner was able only to provide general descriptions of class members' duties; her descriptions, moreover, were consistent with the balance of the undisputed evidence regarding those duties.

96. Dwyre Decl., ¶ 15.

97. Heffelfinger Decl., ¶ 17.

had very little if any discretion."[98] Whether an employee has discretion, however, is judged by examining the actual duties performed, not by the employee's subjective evaluation.

Plaintiffs contend they lacked discretion because they could not make independent decisions with respect to matters of consequence. They argue that EDS is a "highly regulated vertical company" with "layers of oversight," and that their discretion is "limited to minor technical matters, not 'matters of significance' to the business operations of EDS or its customers."[99] There are two problems with this argument. First, plaintiffs appear to conflate the "directly related" inquiry with the "discretion" inquiry. There is no question that, in adopting federal interpretive regulations, California courts have recognized that discretion must be exercised in "matters of significance." See *Combs*, 159 Cal. App.4th at 1266, 72 Cal.Rptr.3d 171 (noting that the Wage Order "also requires that such exercise of discretion and independent judgment pertain to 'matters of significance,' " citing 29 C.F.R. § 541.202(a)).

"Matters of significance," as used in the federal regulations and California law, however, does not concern how closely a given decision is related to the business operations of the employer, but rather "the level of importance or consequence of the work performed." See *id.*; 29 C.F.R. § 541.202(a) ("The term 'matters of significance' refers to the level of importance or consequence of the work performed"). There is thus a critical distinction between a given task's level of importance and the degree to which that task is related to the employer's or a client's business operations.

The second, and more significant, problem with plaintiffs' assertion is that it is based on plaintiffs' testimony that they did not have final decision-making authority because EDS's customers retained authority to decide whether they would approve a recommended course of action. Heffelfinger and Hinds state repeatedly that they were required to get client approval before implementing solutions.[100] As noted, however, the mere fact that others had final decision-making authority does not mandate the conclusion that plaintiffs did not exercise discretion or independent judgment.

In *Paul*, the Court of Appeal noted that the federal regulations define discretion and independent judgment as "involv[ing] the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Paul*, 2007 WL 1786259 at *6 (quoting 29 C.F.R. § 541.202(a)). In this context, the regula-

---

98. Hinds Decl., ¶ 7

99. Pl.'s Opp. at 20.

100. See Heffelfinger Decl., ¶ 18 ("I suggested solutions to accomplish technical specifications received from the DOD regarding what the DOD wanted its network to be able to do. However the DOD representative decided whether or not to implement the solutions I suggested"); *id.*, ¶ 23 ("The Administrators suggested various architectures but the final decision as to what architectural choices were made always rested with the client"); *id*, ¶ 24 ("I presented logical representations of network design which DOD took under advisement as it planned out the proper hardware and implementation details"); Hinds Decl., ¶ 8(b) ("If we needed more servers, I could not simply order more servers, but rather I would have to recommend that we obtain more servers"). Dwyre, by contrast, testified that he did not make recommendations to EDS or clients about new systems, but simply implemented and effectuated policy given to him by others. (Dwyre Decl., ¶ 16.) Although Dwyre did not provide recommendations, the court finds, for reasons discussed *infra*, that he too exercised discretion and that he is exempt.

tions clarify that "acting" can involve "implement[ing] management policies or operating practices; ... perform[ing] work that affects the business operations to a substantial degree, even if ... related to operation of a particular segment of the business; ... provid[ing] consultation or expert advice to management; .. [or being] involved in planning long- or short-term business objectives." 29 C.F.R. § 541.202(b). None of these tasks explicitly requires that an employee have final decision-making authority;[101] indeed, "provid[ing] consultation or expert advice to management"—the precise function in which plaintiffs here were engaged—explicitly assumes that persons other than those providing the consultation or advice will be the final decision-makers.

For this reason, courts have consistently held that final decision-making authority is not a prerequisite to the exercise of discretion. See *In re Farmers Ins. Exchange, Claims Representatives' Overtime Pay Litigation*, 481 F.3d 1119, 1130 (9th Cir. 2007) ("Discretion and independent judgment do not necessarily imply that the decisions made by the employee have a 'finality that goes with unlimited authority and a complete absence of review,' " quoting 29 C.F.R. § 541.202(c)); *Cole v. Daniels, Inc.*, 7 Fed.Appx. 634, 635 (9th Cir. Mar. 26, 2001) (Unpub.Disp.) ("Even if not the final authority, making recommendations for action is part of exercising discretion and judgment"); *Copas v. East Bay Municipal Utility Dist.*, 61 F.Supp.2d 1017, 1026 (N.D.Cal.1999) ("The fact that an employee's decisions are subject to review, and that they may on occasion be reversed, or the recommendations rejected, 'does not mean that the employee is not exercising discretion and independent judgment,' " citing prior regulations).

The *Paul* court utilized this definition of discretion in approving the trial court's finding that "Paul made recommendations to the engineering department and to customers based on his judgment and discretion." *Paul*, 2007 WL 1786259 at *7. Quoting § 541.202(c), it observed that "the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *Id.*

■ Similarly, although the plaintiff in *Combs* had independent decision-making authority, the court cited with approval a case from the Southern District of Florida holding exempt an employee who " 'recommended decisions that directly affected [his employer's] operations and financial future,' ... he 'sometimes spent most of his day problem solving and thinking about ways to improve the network,' and he 'had the discretion to suggest ... equipment purchases, and ways for improving and correcting the network.' " *Combs*, 159 Cal.App.4th at 1267, 72 Cal.Rptr.3d 171 (quoting *Bagwell v. Florida Broadband, LLC*, 385 F.Supp.2d 1316, 1325 (S.D.Fla. 2005)). It is clear, therefore, under both California and federal interpretations, that making recommendations for review by others can constitute exercising discretion, especially if the recommendations go to the administration and improvement of a computer network.

■ Examining the undisputed evidence, it is clear that each of the three named plaintiffs exercised discretion under the definition outlined above. This is per-

---

**101.** For example, an employee may implement management policies without having final authority to set those policies. Planning business objectives similarly does not require final decision-making authority.

haps most obvious with respect to Heffelfinger. As noted, he testified that he was "responsible for the design and integrity of data base structures in a multi-user environment."[102] Although he asserts he did not have discretion to make design decisions on his own, he acknowledges that he and other Administrators "suggested various architectures" and "presented logical representations of network design."[103] He also stated that the government accepted his recommendations approximately fifty percent of the time.[104] Plaintiffs concede that as a participant in the TRB, Heffelfinger "provide[d] input on various technical matters such as whether to install or replace network software applications."[105] Viewed in light of § 541.202(c) and the case law, Heffelfinger's responsibilities clearly constitute tasks requiring discretion and independent judgment. Indeed, as described by Heffelfinger, his job was similar to that of the plaintiff in *Bagwell*, who suggested equipment purchases and ways for improving and correcting the network.

Hinds' testimony supports a similar conclusion. It is undisputed that Hinds "provided solutions to the DOD's technical issues, which included leading and coordinating operational support and implementation activities for DOD's database administration."[106] Hinds was the "point man" for all technical issues related to the DOD's "common access card system."[107]

Similar to the plaintiff in *Bagwell*, he also made recommendations regarding the organization of the database and the purchase of equipment.[108] The undisputed evidence therefore reveals that Hinds exercised "discretion and independent judgement" as required for administrative exemption. It also appears that Hinds' duties involved "matters of significance" to the client's database administration.

Unlike Heffelfinger and Hinds, Dwyre did not testify that he made recommendations to EDS or the client in the course of his work. Dwyre did, however, serve as the Technical team lead for the HCPCS project, which was "highly visible and important" and "critical to the business operations of the [client]."[109] As the team lead, Dwyre allocated tasks among team members, and tracked and reviewed their work. As team lead, he had "more exposure and responsibility in the team meetings" and "customers paid attention to his opinions."[110] Without prompting or direction, Dwyre revised, simplified, and clarified the HCPCS technical guide. In doing so, he utilized his familiarity with HCPCS to make content improvements to the guide.[111] Taken together, these tasks indicate that Dwyre exercised a substantial amount of discretion and independent judgment. Although he worked under general supervisory control, it is undisputed that Dwyre's supervisors "did not have the technical knowledge to direct him on

102. Heffelfinger Decl., ¶ 6.

103. *Id.*, ¶¶ 23–24.

104. Def.'s Facts, ¶ 91; Pl.'s Issues, ¶ 91.

105. Def.'s Facts, ¶ 103; Pl.'s Issues, ¶ 103.

106. Def.'s Facts, ¶ 111; Pl.'s Issues, ¶ 111.

107. Def.'s Facts, ¶ 112; Pl.'s Issues, ¶ 112.

108. Hinds Decl., ¶ 8(b) ("I would have to recommend that we obtain more servers ...");

*id.*, ¶ 8(c) ("If part of a disc is getting to many 'hits', then we need to balance the table space location. I could not make the decision to move table spaces on my own while I was an EDS employee, but any such change had to go through the Change Management Board").

109. Def.'s Facts, ¶¶ 128–29; Pl.'s Issues, ¶¶ 128–29.

110. Def.'s Facts, ¶ 137; Pl.'s Issues, ¶ 137.

111. Def.'s Facts, ¶ 138; Pl.'s Issues, ¶ 138.

how to perform the work he needed to do to accomplish project goals." [112] Applying § 541.202 to all these facts, the court concludes that Dwyre was given a "major assignment[ ] in conducting the operations of the business" and performed "work that affect[ed] business operations to a substantial degree." 29 C.F.R. § 541.202(B–K).

Taken together, the undisputed evidence demonstrates that Heffelfinger, Hinds and Dwyre all exercised a significant degree of discretion and independent judgment with respect matters of significance. Plaintiffs proffer no evidence that the duties of the remaining class members differed in any substantial way from those of the named plaintiffs. Indeed, in response to EDS's assertion that all Database Administrators and Systems Administrator Seniors were involved in "designing system architecture," plaintiffs offered only Heffelfinger's and Hinds' testimony regarding their duties.[113] Similarly, plaintiffs did not dispute EDS's contention that Information Analysts sometimes "develop software," and the only relevant evidence they proffered on the point was Dwyre's declaration regarding his job responsibilities.[114] Because plaintiffs proffer no evidence controverting EDS's assertion that all employees in a relevant job category performed identical or virtually identical functions, the court concludes, based on evidence regarding the job responsibilities of Heffelfinger, Hinds and Dwyre, that all class members exercised discretion and independent judgment in their work at EDS.[115]

**112.** Def.'s Facts, ¶ 143; Pl.'s Issues, ¶ 143.

**113.** See Def.'s Facts, ¶ 15; Pl.'s Issues, ¶ 15.

**114.** See Def.'s Facts, ¶¶ 19–25; Pl.'s Issues, ¶¶ 19–25.

**115.** The court addresses EDS's motion to decertify the class *infra.* It notes here, however, that to the extent plaintiffs argue that the level of discretion exercised by each employee dif-

### 3. The Remaining Prongs

The two remaining prongs of the "duties test" are: (3) that class members performed specialized or technical work requiring special training, experience, or knowledge under general supervision; and (4) that their primary duties meet the test of the exemption as construed in the FLSA regulations incorporated into IWC Wage Order No. 4–2001. Although EDS argued both prongs in its motion and reply, plaintiffs did not address them in their opposition. This constitutes a concession that the two tests are met. See *Resek v. City of Huntington Beach,* 41 Fed.Appx. 57, 58 (9th Cir. July 1, 2002) (Unpub.Disp.) ("[F]ailure to raise an issue in opposition to summary judgment can constitute waiver," citing *Taylor v. Sentry Life Ins. Co.,* 729 F.2d 652, 655–56 (9th Cir.1984)); *Reliance Ins. Co. v. Doctors Co.,* 299 F.Supp.2d 1131, 1154 (D.Haw.2003) ("Failure to raise issues in opposition to summary judgment functions as a waiver").

There can be little dispute, in fact, that class members perform specialized, technical work. While plaintiffs dispute that the nature of the class members' work qualifies them for the administrative exemption, moreover, they proffer no evidence that differentiates the tasks, i.e., that shows *some* of the tasks are administrative while others are not. Consequently, and in light of the court's conclusion that the work performed qualifies for the administrative exemption, plaintiffs cannot rebut EDS's assertion that class members spend more than half their time performing exempt work.[116]

fers, this *supports* decertification because it undermines the court's earlier conclusion that common issues of law predominate, and suggests that an individual, fact-intensive inquiry will be required to determine the exempt or non-exempt status of each member of the class.

**116.** In their opposition, plaintiffs generally disputed EDS's assertion that they "spent over half their time engaged in the duties

For these reasons, there are no triable issues regarding the fact that the final two

described above" (Pl.'s Issues, ¶ 147), but cited no specific evidence supporting the purported dispute. As a consequence, the court treated the fact as undisputed. In a supplemental filing two days after the hearing, plaintiffs argued that they had objected to the testimony EDS proffered as evidence that class members spend more than half their time performing exempt tasks. As the court indicated that it had not considered declarations to which objections were interposed in ruling on the motion, plaintiffs argued that the court could not have found this prong to be undisputed. The court did not rely on EDS's evidence in reaching this conclusion, however, but on plaintiffs' failure to contest the issue in their opposition, which effected a waiver of any contrary claim they may have had. Plaintiffs belatedly assert that the court should have inferred a dispute on this issue from their general evidentiary objections. The mere filing of those objections, however, did not put EDS or the court on notice of the basis on which plaintiffs disputed the underlying fact. Moreover, plaintiffs failed until *after* the hearing to request that the court rule on their objections. Their request therefore came too late.

Even examining the substance of the objections relevant to this issue, the court finds them to be without merit. As noted, plaintiffs objected to portions of the declarations submitted by EDS managers on the grounds that (1) the managers lack personal knowledge; (2) the testimony constitutes hearsay; and (3) the managers proffer improper lay opinion. In support of its assertion that class members spent more than half of their time on exempt duties, EDS cited only one of the declarations to which plaintiffs objected—the declaration of Ralph Nisse. Nisse testified that "[a]s team lead, Heffelfinger spent more than half of his time performing the functions described in Paragraphs 5 through 12 above." (Nisse Decl., ¶ 12.) Nisse was employed as a manager at the Seaside facility and testified that he had personal knowledge of the facts set forth in his declaration. (*Id.*, ¶¶ 1–3.) The fact that he worked in the same facility as Heffelfinger supports Nisse's assertion that he knows Heffelfinger's job duties; plaintiffs, moreover, do not explain the basis of their foundational challenge. Furthermore, Nisse's testimony does not constitute hearsay. Nisse offers his own observations regarding Heffelfinger's work; he does not report out-of-court statements by a third party. Finally,

Nisse does not offer improper lay opinion. He simply lists Heffelfinger's duties (a list that overlaps in most respects with Heffelfinger's undisputed testimony) and observes that Heffelfinger spent more than half of his time on those tasks. Even were the court to consider plaintiffs' objections on the merits, therefore, it would overrule them. There simply is no evidence that plaintiffs performed tasks other than those they describe in their declarations. The clear inference that arises is that they expended not just more than fifty percent, but 100 percent, of their time performing these tasks.

Plaintiffs also filed after the hearing a "request for judicial notice," which contains additional evidence and argument in opposition to the motion that responds to the court's tentative ruling. Plaintiffs did not seek leave to file a surreply; nor did they attempt to justify in any way their late proffer of new proof. Their belated citation of regulatory interpretations, DOL opinion letters, and cases would have been improper even had it occurred at the hearing. See *United States v. Halling*, 232 Fed.Appx. 692, 693 (9th Cir. May 16, 2007) (Unpub.Disp.) ("We do not consider the additional arguments raised for the first time at oral argument," citing *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir.1992)); *White v. FedEx Corp.*, C04–00099 SI, 2006 WL 618591, *2 (N.D.Cal. Mar. 13, 2006) ("The Court will not consider any arguments or evidence raised for the first time at the hearing"). *A fortiori*, such argument is improper two days *after* the hearing. Because plaintiffs did not obtain leave to file a surreply, or show good cause for doing so, the court declines to consider their new arguments. See *Hawai'i Disability Rights Center v. Cheung*, Civil No. 06–00605 DAE–LEK, 2007 WL 2874842, *1, n. 1 (D.Haw. Sept. 27, 2007) ("Insofar as Defendants did not obtain leave of court to file the surreply, the Court will not consider it"); *Hill v. England*, No. CVF05869RECTAG, 2005 WL 3031136, *1 (E.D.Cal. Nov. 8, 2005) ("Although the Court may in its discretion allow the filing of a surreply, this discretion should be exercised in favor of allowing a surreply only where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief"). The court therefore directs the clerk to strike the pleading.

prongs of the "duties" test are satisfied here.

### 4. Conclusion

The undisputed evidence shows that members of the class are administrative workers for purposes of California law. This conclusion is consistent with federal interpretive regulations that are incorporated into the California regulations and with California precedent interpreting the federal and state regulations. The conclusion is supported by *Combs* and by *Bagwell*, which is cited with approval in *Combs*. It is also supported by *Paul*, which, although not binding, involved analogous facts and reinforces the court's analysis here. The only cases addressing the exempt/non-exempt status of IT workers performing tasks similar to those of the database administrators, programmers, and analysts here have held that the workers were exempt. The employees in *Eicher*, *Bothell*, and *Martin*, on which plaintiffs rely, all performed more basic tasks that required less skill and were appropriately considered "maintenance."

The court's conclusion is based entirely on undisputed facts in the record and on the named plaintiffs' testimony. While the parties have raised a multitude of factual disputes, they do not alter or affect analysis of the central questions in this case—whether the class members' work was "directly related to management policies or business operations" and whether they exercise "discretion and independent judg-

ment." Consequently, the court grants EDS's motion for summary judgment.

### E. Other Issues

The parties raise a number of other issues. Principal among these is EDS's motion to decertify the class. In addition to seeking decertification, EDS argues that Hinds should be judicially estopped from asserting a claim because he failed to disclose the claim in the course of a bankruptcy proceeding.[117] It also asserts that some class members are subject to California's separate "computer workers" exemption. Because the court grants EDS's motion with respect to application of the administrative exemption, it declines to address these issues in detail. It does, however, make two observations below.

### 1. Motion to Decertify the Class

EDS moves to decertify the class on the basis that (1) the legal question that is common to the class has been resolved in its favor and (2) for the reasons articulated in its opposition to plaintiffs' motion for class certification, the class should not have been certified in the first instance. As respects EDS's first argument, the court agrees that the question common to the class—whether the class members are administrative employees—must be resolved in EDS's favor. The proper remedy, however, is to enter summary judgment in EDS's favor, not to decertify the class.[118] EDS's remaining arguments provide no basis for revisiting class certification.[119]

---

117. The court declines to address EDS's judicial estoppel argument, as it has determined that Hinds' claim fails on the merits.

118. Stated differently, the common question identified by the court as grounds for certification under Rule 23(b)(3) has been resolved in EDS's favor. The court's conclusion is that the IT workers are *all* administrative employees. EDS's concurrent motion to decertify appears contingent on an adverse ruling on its motion for summary judgment.

119. Mere repetition of arguments that the court declined to accept in deciding plaintiffs' motion for certification are not adequate to support a decertification request. See *Cornn v. United Parcel Service, Inc.*, No. C03–2001 TEH, 2006 WL 449138, *5 (N.D.Cal. Feb. 22, 2006) ("[T]he Court will not entertain motions that simply repeat the same arguments raised in opposition to Plaintiffs' class certification motion").

## 2. Computer Employees Exemption

By EDS's own admission, the computer employees exemption applies, at best, only to *some* class members, i.e., those whose "hourly rate is not less than thirty-six dollars." CAL. LAB. CODE § 515.5(3). EDS estimates that "approximately one-third of the Class" is exempt under this provision.[120] It fails to identify, either by name or description, the individuals to whom the exemption purportedly applies, however, a fact that makes impossible any precise ruling regarding its applicability.

## III. CONCLUSION

For the foregoing reasons, the court grants EDS's motion for summary judgment in its entirety. It also directs the clerk to strike plaintiffs' unauthorized sur-reply.

---

120. Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Def.'s Mem.") at 20.